IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

**ROBERTA FOSBINDER-BITTORF**
individually and on behalf
of all others similarly situated,

                    Plaintiff,               Case No:  11-cv-592

      vs.

**SSM HEALTH CARE OF WISCONSIN, INC.**

             Defendant.

**PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## <u>INTRODUCTION</u>

Defendant's early motion for summary judgment on the claims of Roberta

Fosbinder-Bittorf ("Plaintiff") ignores both the legal basis of the Plaintiff's claims as

well as the myriad of unresolved factual disputes in the record.

The factual record in this case has only been developed for a few months. To

date, the focus of discovery has been on the Plaintiff's motion to conditionally certify

her 29 U.S.C. § 216(b) class.[1] Nevertheless, the factual record, even at this early

stage, is more than sufficient to establish that material issues of factual dispute

exist regarding both the Plaintiff's claims under Wisconsin law and her claims

under the Fair Labor Standards Act (FLSA).

---

[1] The parties have no agreement that Defendant may file multiple motions for summary
judgment. Pursuant to the Court's scheduling order, the deadline for filing dispositive
motions is not for another eight months.

Wisconsin law requires that employees be paid for meal periods where the employee is required to remain on premises. The record shows that Defendant was well aware that its nurses, including the Plaintiff, were subject to a policy which restricted them from leaving the hospital during unpaid meal periods. In fact, Defendant's time records confirm that the Plaintiff and her fellow nurses uniformly complied with Defendant's policies and remained on premises during their unpaid meal periods. Despite this, Defendant claims that it was not aware the Plaintiff and more than 1,000 nurses subject to this class and collective action lawsuit virtually never left the facility during unpaid meal periods.[2] Instead it claims they were somehow confused about what Defendant's policies were or always remained on premises because they never felt like leaving. Such flimsy allegations do not support a finding of summary judgment for Defendant on the Plaintiff's Wisconsin law claims.

Further, Defendant admits that the Plaintiff performed uncompensated work during unpaid meal periods; however it would prefer not to have to pay her for her work.[3] The Plaintiff, other nurses on her unit, as well as nurses on other units,

---

[2] Defendant has been presented with the Plaintiff's analysis of its time clock records showing that nurses virtually never left the facility in conjunction with the Plaintiff's Motion for Conditional Class Certification, and has offered no rebuttal to its veracity in its response to that motion or in its Motion for Summary Judgment and its Proposed Findings of Fact related to the same.

[3] In Defendant's moving papers, it states "[f]or the purposes of this Motion for Summary Judgment, the Hospital will assume that Plaintiff was not paid for some meal periods when she worked due to her failure to cancel the meal period deduction, but reserves the right to challenge that allegation later, if necessary." (Dkt. 72, Defendant's Brief in Support of Summary Judgment ("Defendant's Brief") at n.2).

lodged complaints with management and human resources that frequent interruptions caused missed meal periods, which were not cancelled. These complaints did not result in action by Defendant to ensure all work was compensated. Instead, Defendant enjoyed the benefit of uncompensated work by loosely monitoring an automatic deduction policy which was causing overwhelmed and overworked nurses to lose pay for work performed.

The law does not permit Defendant to seek refuge behind its ignorance or indifference to the uncompensated work that was being performed on its behalf. Defendant derived the benefit of that work and must compensate its employees for its performance. For all of the reasons detailed below, Defendant's premature Motion for Summary Judgment should be denied and Defendant should not be permitted to file additional motions for summary judgment.

<u>DISPUTED MATERIAL FACTS</u>

**I.     DEFENDANT MAINTAINED A POLICY OF AUTOMATICALLY DEDUCTING 30 MINUTES OF PAY FROM THE PLAINTIFF'S WAGES FOR EVERY SHIFT SHE WORKED**

Every nurse working at St. Mary's Hospital ("St. Mary's" or "the Hospital"), including the Plaintiff, is subject to the Hospital's automatic meal deduction policy. (Plaintiff's Proposed Findings of Fact ("PFOF") ¶19). Under this policy, a half-hour meal period is automatically deducted from the pay of each St. Mary's nurse for each shift he or she works over five and a half hours. (PFOF ¶20). If a St. Mary's nurse wishes to receive pay for his or her meal period, he or she must either actively "cancel" the meal period by pressing a button on the time clock at the end of the

shift, or complete a "Human Resource Management Information System" (HRMIS) or "maintenance" sheet to add the cancelation. (PFOF ¶21).

## II.   PATIENT SAFETY IS PARAMOUNT TO ST.  MARY'S AND ITS NURSES

St. Mary's shares a common mission statement: "[t]hrough our exceptional healthcare services, we reveal the healing presence of God." (PFOF ¶14). In order to accomplish this goal of exceptional care, St. Mary's nurses are expected to perform their job duties in a manner adhering to St. Mary's policies and procedures. (PFOF ¶15). St. Mary's nurses' primary job function is to provide patient care. (Id.).

The components of patient care are described by St. Mary's as monitoring the patient, following up on physician's orders, making a determination as to additional care that might be needed, logging the appropriate information on the electronic health care record, and responding to patient needs. (PFOF ¶16). St. Mary's describes patient safety as "paramount" and the primary goal of St. Mary's nurses. (PFOF ¶17). St. Mary's makes its policies known to its employees so that the employees can provide exceptional patient care. (PFOF ¶18).

## III.   DEFENDANT REQUIRED THE PLAINTIFF TO REMAIN ON PREMISES DURING UNPAID MEAL PERIODS

Despite the automatic deduction policy, St. Mary's nurses, including the Plaintiff, are not able to leave the premises during their unpaid, half-hour meal period. (PFOF ¶¶22, 39). Whereas other hospital employees, like housekeeping or secretarial staff, may be able to leave the premises on their lunch breaks, nurses

are required to stay at the hospital during their meal breaks because they have patient responsibilities, including responding to Codes. (PFOF ¶¶23, 38).

Responding to Codes is a job duty of St. Mary's nurses. (PFOF ¶35). Codes are announced hospital-wide on a public address system. (Id.). One such code is a "Code Blue." A Code Blue refers to a situation in which a patient is in imminent danger. (PFOF ¶33). Nurses that are part of the code team are required to respond along with the nurses of the particular unit for which the code was called. (PFOF ¶36). Specifically, Defendant's Code Blue Plan states that in the case of a Code Blue (for cardiopulmonary arrest, medical emergency or a traumatic accident), "the RN responsible for the patient assists with the code, provides CPR and answers questions during the code. He/she is responsible to remain at the scene to provide pertinent patient information." (PFOF ¶34).

St. Mary's nurses are not relieved of their responsibility to respond to Code Blue calls during their unpaid meal periods. (PFOF ¶¶37).  To provide the best care for patients in critical need, nurses are required to remain within earshot of the public address system in order to respond to codes during their unpaid meal periods. (PFOF ¶38). This requirement prevents St. Mary's nurses, including the Plaintiff, from leaving the facility during their unpaid meal periods. (PFOF ¶39).

### A.   The Plaintiff's Supervisors Told the Plaintiff She Could Not Leave the Premises During Her Unpaid Meal Periods

During Plaintiff's initial training as a newly hired nurse for St. Mary's Hospital, Plaintiff's supervisor, Unit Director Mary Sutton, told Plaintiff that she

could not leave the premises over her meal period because she had to be available to return to her unit if a Code Blue was called. (PFOF ¶42). Charge nurses affirmed this was the policy, and it was discussed in staff meetings which were often led by unit directors. (PFOF ¶43).

Plaintiff understood that it was imperative to have the treating nurse available in the case of a Code Blue as a detailed history of the patient's recent symptoms or behaviors, or information regarding their medication could only be supplied by the treating nurse. (PFOF ¶41).

Plaintiff's understanding is consistent with those nurses on other units. The opt-in plaintiffs agree that St. Mary's did not allow them to leave hospital premises during meal periods because they were required to respond to Code Blue calls on their respective units and to assist with patients. (PFOF ¶¶22, 37). Members of management told these nurses that they could not leave. (PFOF ¶¶ 24, 42). Like the Plaintiff, opt-in plaintiffs never left the facility during their meal periods out of fear that they would be disciplined. (PFOF ¶25).

## B.    The Plaintiff Was Reprimanded for Not Responding to A Code Blue During Her Meal Period

The Plaintiff missed a Code Blue call on one occasion during her employment, while she was taking her meal break. (PFOF ¶44). As a result of her failure to respond, a charge nurse took Plaintiff aside and lectured her for her error. (PFOF ¶45).  Plaintiff had been eating in the cafeteria and did not hear the code called. Upon her return to the unit, the charge nurse reiterated to Plaintiff St. Mary's

policy: when a code is called on a particular unit, all nurses from that unit, regardless of if they are eating, are to return to the unit in order to be available to assist. (PFOF ¶46).

## IV. DEFENDANT KNEW THAT THE PLAINTIFF AND HER COLLEAGUES WERE NOT PERMITTED TO AND DID NOT LEAVE THE PREMISES DURING THEIR UNPAID 30 MINUTE MEAL PERIOD

### A. Nurses Were Required to Punch Out When Leaving the Facility

All St. Mary's nurses are required to card out of the Kronos time clock if they leave the premises for any non-work time, including if they were to leave during a meal period. (PFOF ¶47). The Plaintiff similarly understood that if she had to leave the hospital, for any reason, during her shift, she was required to punch out of the time clock before leaving. (PFOF ¶27).

### B. Defendant's Time Clock Records, Reviewed Weekly by its Management, Show That the Plaintiff and the Putative Class Members Virtually Never Left the Premises During an Unpaid Meal Periods

Management is required to review employees' Kronos punch data each pay period to ensure that each employee's time is accurate based on their knowledge of when people work. (PFOF ¶48). Management reviews when employees punch-in and punch-out, including when employees punch-out during their shift because they left the facility. (PFOF ¶50).[4] As such, anytime any nurse leaves St. Mary's Hospital during their meal period, Management has a record of the employee's absence and is required to review that record. (PFOF ¶¶47, 48, 50).

_____

[4] Management also reviews exceptions, such as the "cancel deduct" exception and can see how many times an employee cancels the automatic deduction during any particular time period. (PFOF ¶51).

Defendant has produced these daily time clock or Kronos records for each of the over 1,000 putative class members, including the Plaintiff, during the three year statutory period applicable to these claims. (PFOF ¶52). These entries were analyzed by comparing the actual time in and actual time out punches for each entry. (PFOF ¶54). Those entries were then filtered to include only those entries where there was a difference between the time out punch and the time in punch that was greater than five (5) minutes and less than forty-five (45) minutes. (PFOF ¶55). ,Given Defendant's policy regarding clocking out before leaving the facility, these five (5) minute to forty-five (45) minute off the clock periods capture any time an employee potentially left the facility during an unpaid meal break. (PFOF ¶56). This method also presumably catches similar punches made for other reasons; however, the data is significant even if it may be over inclusive. (PFOF ¶57).

The 992,245 lines of data reveal 5,055 instances when an employee punched out mid shift for a time period between five (5) minutes and forty-five (45) minutes. (PFOF ¶52). Put another way, assuming every such punch was an instance where an employee left the facility during an unpaid meal period, nurses did so during approximately 0.5% of the time, or one out of every 200 times in which the nurse punched in and out. (PFOF ¶59).

This same analysis was performed on the Kronos data provided for the Plaintiff. (PFOF ¶60). The data for the Plaintiff revealed one instance during the

8

relevant statutory period where she punched out for a period between five and forty-five minutes during a shift. (PFOF ¶¶61).[5]

## V.   DEFENDANT KNEW THAT THE PLAINTIFF WAS SUBJECT TO INTERRUPTIONS DURING MEAL PERIODS

### A.   The Beeper System

While working, Plaintiff was required to carry a beeper on her in order to receive pages related to her patients, including doctor calls, messages from charge nurses, or other patient needs. (PFOF ¶65). St. Mary's advises nurses to hand their beepers off to another nurse when they go on break. (PFOF ¶66). Notwithstanding this formal instruction, nurses are not always able to hand off their beeper while taking their meal break. (PFOF ¶¶67, 68). Thus, many nurses, Plaintiff included, took their beepers with them while they ate. (PFOF ¶68). When this happened, the Plaintiff was occasionally interrupted by her beeper while on break. (PFOF ¶69).

Defendant knew that carrying a beeper while on break was a frequent occurrence. The Plaintiff complained to her unit director and human resources about not being able to hand her beeper off while on break. (PFOF ¶70). Understaffing contributed to the nurses' inability to hand off their beepers. (PFOF ¶73).

Beyond the Plaintiff's direct complaints, St. Mary's had another reason to be aware that nurses were not able to hand off their beepers during meal breaks. In

---

[5] It is likely that this instance is the result of the Kronos time clock malfunction. (PFOF ¶62). On this particular day, September 22, 2010, Kronos recorded 22 different in-punches and 22 different out-punches for Ms. Fosbinder during an approximately nine hour time span. The punches are out of order, and often, the out-punch and subsequent in-punch are for the same time. (Id.).

multiple staff meetings, Defendant, through its unit director, recognized that "people are still taking beepers on breaks." (PFOF ¶71). Nurses were refusing to accept beepers, nurses were unable to accept beepers because they already had too many to monitor, and some nurses were too busy to give up their beeper and go on a break, so they took their beeper with them while they ate quickly. (PFOF ¶72).[6]

### B.    Other Meal Break Interruptions

In addition to the failed beeper buddy system, the Plaintiff and her colleagues were obligated to work during their meal periods due to a heavy work load and interruptions from doctors, nurses, and patient's family members. (PFOF ¶¶ 74, 75, 83, 84, 85, 87, 89). Unit Directors witnessed interruptions to nurses' meals. (PFOF ¶¶76, 86, 89). The interruptions lasted a range of time, from a few minutes to the whole break. (PFOF ¶¶79, 87).

Plaintiff complained to her supervisor and human resources about having to work over her meal period. (PFOF ¶83). Other nurses on Plaintiff's unit similarly complained to management that "every shift was short staffed," they were "tired of not having a meal break," that they "often [sat] in the back room with lunch on [their] knees and [ate] real quickly," that they didn't even "have the opportunity to leave the unit and go to the cafeteria anymore," that "others [weren't] willing to help others take a break, take pager or phone because of their attitude or [were]

---

[6] There were multiple staff meeting notes in the Plaintiff's unit alone where complaints about the inability to hand-off beepers were made. (PFOF ¶¶71, 84; See also Exhibits 2, 3, 4, 5 to Parsons' Dec). To date, Defendant has refused to produce staff meeting notes from the units in which neither the Plaintiff nor the opt-in plaintiffs worked. Declaration of William E. Parsons submitted in opposition to Defendant's Motion for Summary Judgment (Parsons' Dec.) ¶2.

just overworked themselves," and "a lot of people work overtime to chip in." (PFOF ¶84).

## VI.   DEFENDANT WAS AWARE THAT IT WAS IMPOSSIBLE FOR NURSES TO CANCEL EVERY INTERRUPTED MEAL PERIOD

Nurses did not cancel every automatic deduction for every meal they missed. (PFOF ¶63). Missed meal periods happened so frequently, that if nurses ate anything, it was considered a meal, and they did not cancel their meal period deduction. (PFOF ¶90). When the Plaintiff's meal period was less than thirty minutes long, the Plaintiff did not cancel the automatic thirty minute deduction. (PFOF ¶80). The Plaintiff understood that if you got a meal break, regardless of the length, "that was your break."(PFOF ¶82). During training, the Plaintiff was led to understand that if you were able to take a quick, though less than 30 minute break, it was not cancelled. (PFOF ¶81). Additionally, the Plaintiff frequently was too busy to remember to cancel the automatic meal period deduction, and later could not recall the precise day she missed her meal.  (PFOF ¶91). Defendant failed to ensure compliance with its meal break policy. Knowing that nurses were not able to leave the premises and that they were not always able to take full meal breaks, Defendant simply reminded them that "it [was] expected that everyone receive an uninterrupted 30 minutes break from the floor." (PFOF ¶92).

Defendant was further aware that a primary cause of missed or interrupted meal breaks was understaffing. (PFOF ¶¶73, 84, 88). There were no nurses available to relieve the Plaintiff of her work duties, so she could not take a meal

11

break. (PFOF ¶67). Because Plaintiff was scheduled for 8.5 hour shifts, any time Plaintiff canceled a meal break, she would incur overtime. (PFOF ¶¶10, 11). Despite Defendant's knowledge that shifts were understaffed, Defendant also expected nurses to keep overtime to a minimum, ideally less than two percent. (PFOF ¶¶101, 102, 104). Defendant trained management to minimize overtime. (PFOF ¶49). Nurses could be subject to discipline if they incurred too much overtime. (PFOF ¶103).

Defendant did nothing to ensure that that unrestricted meal breaks were actually attainable for the Plaintiff and her coworkers. (PFOF ¶¶97-99).  It did not increase staffing or administer a formal break schedule. (PFOF ¶97, 99). In an unpredictable environment where a patient emergency could occur at any moment, Defendant placed the burden on the nurses, daily, to find a way to get 30 minutes relief from their patients and to find other nurses to accept their beepers and patient load. (PFOF ¶66, 92).

## <u>ARGUMENT</u>

## I.   THE SUMMARY JUDGMENT STANDARD

A court should not grant summary judgment unless the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Cengr v. Fusibond Piping Systems, Inc.</u>, 135 F.3d 445, 450 (7th Cir. 1998), <u>quoting</u> F.R.C.P. 56 (c).  A genuine dispute of fact

exists, and summary judgment will not survive, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>Doe v. Allied Signal, Inc.</u>, 925 F.2d 1007, 1008 (7th Cir. 1991). The court is not permitted to "substitute its judgment concerning the weight of the evidence for the jury's" (<u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 153 (2000)), and "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." <u>Id.</u>, 530 U.S. at 150-51, <u>quoting</u> <u>Anderson</u>, 47 U.S. at 255. Instead, "the evidence of the non-movant is to be believed" by the court and "all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255. Finally, the granting of summary judgment is a "drastic remedy" which is never warranted except on a clear showing that no genuine issue as to any material fact remains for trial. <u>Mintz v. Mathers Fund, Inc.</u>, 463 F.2d 495, 498 (7th Cir. 1972).

## A. Defendant's Early Motion for Summary Judgment Ignores the Court's Scheduling Order and Asks The Court to Consider Liability Issues on an Undeveloped Factual Record.

Defendant's early motion for summary judgment ignores that Court's scheduling order and asks the Court to take the drastic step of disposing of a case on an undeveloped factual record, when discovery remains open for more than eight months.

Defendant filed its motion for summary judgment on the heels of its opposition to Plaintiff's motion for conditional class certification. In collective action cases, the motion for conditional certification occurs early in the case, well prior to

the close of the discovery period. See Thompson v. K.R. Drenth Trucking, Inc., 2011 U.S. Dist. LEXIS 63753, *2 (S.D. In. 2011).[7] As in Thompson, the Plaintiff's motion for conditional class certification was filed at an early stage of the case. On January 9, 2011, just three months after the discovery period opened in the case, plaintiff filed her motion for conditional class certification. Dkt 28. That motion has been fully briefed and is pending before the Court.

The dispositive motion deadline in this case is October 15, 2012. Dkt. 11. As is typical with this Court's scheduling orders in class and collective action cases, the dispositive motion deadline is preceded by deadlines for motions for Conditional Class Certification, Fed. R. Civ. P. 23 Class Certification, Motions for Decertification, and the deadlines for disclosure of liability experts by both parties. Dkt. 11.

Defendant's motion for summary judgment attempts to take advantage of the fact that the focus of discovery to date necessarily has been on the Plaintiff's motion for Conditional Class Certification, and not focused on issues regarding liability. This is so because the merits are not considered at the conditional certification stage. Thompson, 2011 U.S. Dist. LEXIS 63753 at *2. In spite of this, the factual record is robust with evidence sufficient to create material issues of factual dispute regarding the Plaintiff's Wisconsin law and FLSA claims.

---

[7] All unpublished cases are attached as Exhibit 10 to Parsons' Dec.

14

## B.   Multiple Motions for Summary Judgment are Disfavored by This Court and Are Not Contemplated by the Scheduling Order

Given Defendant's tactical decision to file this early motion, however, the Plaintiff requests that any future request by Defendant to have another attempt at summary judgment be denied. The scheduling order in this case unequivocally states that "[a] party may not file more than one motion for summary judgment in this case without leave of court." Dkt. 11. Despite this, Defendant has indicated that it intends to file separate motions for summary judgment on the claims of each opt-in Plaintiff. Dkt. 68 at n.4. Defendant should not get more than one bite at the apple.

Filing numerous motions for summary judgment unnecessarily exhausts the Court's resources. Plaintiff is aware of instances where the parties agreed to filing of multiple motions for summary judgment in similar matters, to dispose of discrete legal issues. See <u>Spoerle v. Kraft Foods Global, Inc.</u>, 527 F. Supp. 2d 860, 861 (W.D. Wis. 2007, Crabb, J.) (Where the parties entered into a stipulation allowing motions for summary judgment prior to class certification on discrete legal issues). The parties, however, have had no such discussions in this case, nor was Defendant's anticipated approach brought to the Court's attention during the Fed. R. Civ. P. 16 conference. As such, the Plaintiff requests that any future leave sought by Defendant to file additional motions for summary judgment be denied.

## II.   FACTUAL ISSUES EXIST THAT PRECLUDE SUMMARY JUDGMENT ON THE PLAINTIFF'S WISCONSIN LAW CLAIMS

Defendant's arguments for summary judgment on Plaintiff's state law claims fail. Wisconsin law requires employers to pay employees for all meal periods during which it requires its employees to remain on premises. Ample evidence in the record supports that Defendant maintained a policy of requiring the Plaintiff, as well as other nurses, to remain on premises during their unpaid meal periods. Defendant was aware of its policy. Defendant was aware that its nurses, including the Plaintiff, were complying with the policy by not leaving the facility during unpaid meal periods. As such, a factual dispute exists because the facts show that the Plaintiff, like other St. Mary's nurses, could not and in fact did not leave the facility during her unpaid meal periods.

### A.   Wisconsin Law Requires Employers to Compensate Employees for All Meal Periods during Which They are Required to Remain on the Employer's Premises

Under Wisconsin law, employers must pay employees for "on duty meal periods" which are counted as "work time." Wis. Admin. Code DWD § 272.04(1)(c). The Wisconsin Administrative code defines an "on duty" meal period as one where the employee is not free to leave the premises of the employer. Id.

Further, under Wisconsin law, an employee also is considered "on duty" if the employer does not provide at least one half hour free from work. Id. The employee must be compensated unless he has been "completely relieved from duty for the purpose of eating regular meals." Wis. Admin. Code. DWD § 272.12(2)(c)(2). The

16

employee is not relieved if she is required to perform <u>any</u> duties, whether active or inactive, while eating. <u>Id.</u> (emphasis added).[8]

St. Mary's requirement that its nurses, including the Plaintiff, be available to respond to "Codes" during their unpaid meal periods, which are announced over a public address system, prevented them from leaving the premises during unpaid meal periods. The Plaintiff's testimony, the testimony of the other opt-in Plaintiffs, and Defendant's own time clock records reveal that its nurses almost never left the premises during their unpaid meal periods. (PFOF ¶¶22, 25, 35, 39, 52, 53, 58, 59).

**B.    A Material Issue of Factual Dispute Exists As The Plaintiff Was Not Permitted to Leave the Hospital Premises During Her Unpaid Meal Periods**

> **i.    Defendant Instructed The Plaintiff Not To Leave The Premises During Her Meal Periods Because She Had to Be Available to Respond to Code Blues.**

St. Mary's was aware that the Plaintiff and her coworkers could not leave during meal periods because it instructed her not to do so. The Plaintiff performed work during <u>all</u> of her meal breaks for which she did not cancel the deduction because she was not permitted to leave St. Mary's Hospital during her unpaid meal periods.

The Plaintiff does not, as Defendant suggests, simply offer "vague testimony" regarding her understanding of the Hospital's policy prohibiting her from leaving

---

[8] Interrupted meal periods are similarly compensable under the FLSA. For that reason, Plaintiff reserves her discussion of the existence of factual disputes related to interrupted or missed meal periods to her discussion of the FLSA violation. Any violation of the FLSA, and fact issues related to those violations, are similarly issues related to the Plaintiff's state law claims.

the premises. Nor is she confused as to how Defendant's meal break policy operated. The Plaintiff's understanding is consistent with Defendant's written policy, and has been affirmed by her managers and fellow nurses throughout her employment at St. Mary's Hospital. (PFOF ¶¶22-25, 34, 38-39, 42-43, 46).

During St. Mary's new employee training, the Plaintiff's supervisor, Unit Director, Mary Sutton, told the Plaintiff that she could not leave the premises during her meal period because she had to be available to return to her unit if a Code Blue was called. (PFOF ¶42). The Plaintiff's understanding of Defendant's meal break policy was affirmed by charge nurses, her coworkers, and through discussions at staff meetings led, in part, by her unit director. (PFOF ¶42).

The Plaintiff's understanding, and that of her fellow nurses, is consistent with Defendant's written policies. Codes are announced hospital-wide over the public address system. (PFOF ¶32). Nurses that are part of the code team are required to respond along with the nurses of the particular unit for which the code was called. (PFOF ¶36). Specifically, Defendant's Code Blue Plan states that in the case of a Code Blue (for cardiopulmonary arrest, medical emergency or a traumatic accident), "the RN responsible for the patient assists with the code, provides CPR and answers questions during the code. He/she is responsible to remain at the scene to provide pertinent patient information." (PFOF ¶34). Plaintiff understood that it was imperative to have the treating nurse available as a detailed history of the patient's recent symptoms or behaviors, or information regarding their medication

could only be supplied by the treating nurse. (PFOF ¶41). The Code Blue Plan does not contain an exception for meal periods. (PFOF ¶¶34, 37).

The Plaintiff's understanding is also consistent with that of nurses on other units. The opt-in plaintiffs agree that St. Mary's did not allow them to leave hospital premises during meal periods because they were required to respond to "Code Blue" calls on their respective units and because they were required to assist with patient care duties. (PFOF ¶37). Members of management told them that they could not leave. (PFOF ¶24). Like the Plaintiff, they too never left the facility during their meal periods out of fear that they would be disciplined. (PFOF ¶25).

Defendant suggests that the Plaintiff was never formally disciplined for failing to respond to Code Blues, and the restriction on the Plaintiff was "an illusory one at best." (Defendant's Brief at 13). This is not accurate.

The Plaintiff did miss a Code Blue during a meal period because she was in the cafeteria and did not hear the PA system. (PFOF ¶46). As a result of her failure to respond, a charge nurse took the Plaintiff aside and lectured her for her error. (PFOF ¶45). The charge nurse reiterated St. Mary's policy to the Plaintiff. That is: when a code is called on a particular unit, all nurses from that unit, regardless of if they are eating, are to return to the unit in order to be available to assist. (PFOF ¶46).

The Plaintiff and her coworkers did not obtain their understanding of Defendant's Code Blue out of thin air. To the contrary, Defendant's written policy requires the treating nurse to assist with the code and "to provide pertinent patient

19

information." (PFOF ¶34). During training, Plaintiff's supervisor told Plaintiff that she could not leave the premises during her meal period because she had to be available to return to her unit if a Code Blue was called. (PFOF ¶42). Defendant knew that its policy was for nurses, including Plaintiff, to remain on hospital premises during their entire shift because they had to respond to Code Blues.

Consistent with Defendant's policy, the Plaintiff did not leave the St. Mary's facility during any of her unpaid meal periods. As discussed below, Defendant's own time clock records confirm this.

Nothing is more important to St. Mary's than providing excellent care to its patients. (PFOF ¶17). To accomplish this mission, St. Mary's instituted policies that ensured that nurses would be ready and available to treat patients. These policies required that St. Mary's nurses remain on the premises during their meal periods. Because the Plaintiff was restricted from leaving the facility during unpaid meal periods, consistent with a hospital wide policy, fact issues exist with regard to the Plaintiff's claim for unpaid wages under Wisconsin law.

      ii.      **Defendant Knew That Plaintiff and Her Colleagues Were Not Leaving the Premises During Their Unpaid Meal Periods**

Defendant's time records confirm that the Plaintiff and her coworkers remained on site during nearly every one of their unpaid meal periods. Notably, Defendant does not dispute this in its memorandum in support of its motion for summary judgment.

20

Defendant's policies require managers to review nurse's time records weekly. Further, nurses were required to punch out each time they left the facility. As such, the Plaintiff's managers had actual knowledge that the Plaintiff remained at St. Mary's Hospital, consistent with Defendant's policies, during all of her unpaid meal periods.

All St. Mary's nurses, including the Plaintiff, were required to card out if they left the premises for any non-work time, including if they were to leave during a meal period. (PFOF ¶47). As such, Defendant's time clock records indicate every time a nurse left the facility during an unpaid meal period.

Defendant's time records reveal that the over 1,000 putative class members only punched out and left the facility during .05% of the their breaks, if that. (PFOF ¶¶52, 59). In line with this, the Defendant's records for the Plaintiff show only one occasion where she may have punched out during a meal period. (PFOF ¶61).

Management knew that the Plaintiff, and her coworkers, never left the premises because they regularly reviewed nurses' Kronos timecard data. (PFOF ¶¶48, 50). The Kronos data would show any instance where a nurse clocked out and left the facility during an unpaid meal period. (PFOF ¶¶47). Pursuant to St. Mary's policy, Management was required to review the employees' punch times each pay period. (PFOF ¶48). These managers could see when employees punched-in and out, including whether employees punched out during their shift. (PFOF ¶¶50).Therefore, any time an employee left St. Mary's Hospital during their meal period, management would have had a record of the employee's absence.

21

Defendant's own time clock data supports the fact that Plaintiff and her fellow nurses were not simply choosing to remain on the premises, but rather, they were told not to leave and in fact did not leave. Moreover, Managers, who were required to review all time cards each pay period, were aware that Plaintiff was not leaving during her meal period. While it may be plausible that St. Mary's was not aware that one nurse was not leaving the facility during any of her meal periods, when a workforce of over 1,000 nurses virtually never leave the premises during the unpaid meal period, it is fair to impute constructive knowledge on Defendant.

The factual record supports that Defendant knew or had constructive knowledge that the Plaintiff was not permitted to and did not leave the facility during her unpaid meal period. As such, Defendant's motion for summary judgment should be denied.

   iii.  **Defendant's Hospital-Wide Meal Break Policy Supports The Fact That The Plaintiff Could Not Leave During Unpaid Meal Periods**

Defendant's written hospital-wide policy for all employees does not dispose of the issue that the Plaintiff and her fellow nurses could not leave the hospital premises during their meal period. Even if the policy were entirely unambiguous, it would not decide the issue because the Plaintiff and her coworkers were told by Defendant they could not leave. (PFOF ¶24, 42). Nevertheless, a close look at the language in Defendant's policy reveals it is not as definitive as Defendant would like this Court to believe.

22

St. Mary's formal policy states that for all employees, not only nurses, "activities are <u>typically</u> unrestricted" during the meal period. (PFOF ¶30) (emphasis added). Notably absent from the policy is language stating something to the effect, "over meal periods, all employees are free to do as they choose, including leave the premises." Defendant has "no idea" what the terms "typically unrestricted" means, and it is unable to explain why *typically* is there. (PFOF ¶31). "Typically" implies there is an exception, and in this case, the nurses' activities were that exception.

The Plaintiff understood that nurses, like her, were expected to remain in the hospital during her meal periods to be available for their patients and to respond to Code Blues. (PFOF ¶¶38-41). Whereas other staff, like housekeeping or secretarial staff may have been able to leave the premises on their lunch breaks, nurses had patient responsibilities, including responding to codes, so they had to stay in the hospital. (PFOF ¶23). Although the Plaintiff desired to leave during her meal period, she was instructed to stay and did so. (PFOF ¶25, 26, 42). Further, Defendant never instructed the Plaintiff that she could cancel a meal period because she was unable to leave. (PFOF ¶26).

At best, St. Mary's meal break policies were unclear. At worst, St. Mary's wrote the policies knowing full well that nurses' meal break activities were "atypical" since nurses, unlike other employees, were "expected to remain in the hospital" at all times unless given permission otherwise. The bulk of the evidence suggests the latter. As such, Wisconsin law required Defendant to compensate its nurses for all meal breaks as they were unable to leave the premises.

Ultimately, the Plaintiff did remain on the premises in accordance with Defendant's expectation in its Code Blue Plan that nurses keep themselves available to respond to emergencies. Defendant's written policy implied this expectation, and Plaintiff's supervisor instructed her of the same. Defendant knew that the Plaintiff was complying with the policy requiring that she remain on the premises, and therefore should have compensated the Plaintiff accordingly. Given all of this, factual issues related to whether the Plaintiff was permitted to leave the facility during unpaid meal periods do exist and summary judgment on Plaintiff's state law claims cannot stand.

## III.   FACTUAL ISSUES EXIST WHICH PRECLUDE SUMMARY JUDGMENT ON THE PLAINTIFF'S FLSA CLAIMS

Defendant pleads ignorance of the Plaintiff's uncompensated work in its attempt to resolve Plaintiff's FLSA claims through summary judgment. Nevertheless, allowing work to be performed, gaining the benefit of that work, but then turning a blind eye to such work is not sufficient to avoid liability under the FLSA.  Defendant's motion for summary judgment fails because it maintained a policy under which it was aware its nurses, including the Plaintiff, were performing uncompensated work. Further, the evidence in the record demonstrates that Defendant had actual knowledge that work was being performed.

### A.   It is Defendant's Duty to Monitor the Conditions of Employment and to Keep Accurate Time Records

Defendant attempts to escape liability for uncompensated time that it suffered and permitted the Plaintiff to work by placing the blame on the Plaintiff for

24

failing to cancel <u>all</u> automatic deductions for <u>all</u> meal periods that she missed or was interrupted. In so doing, Defendant draws the Court's attention to the Plaintiff's shortcomings in an effort to distract this Court from its initial obligation to exercise its control over the employees' work conditions by which the employer benefits.

The FLSA does not prohibit Defendant from attempting to save money by automatically deducting meal periods from the pay of its nurses. The FLSA, however, does require that Defendant ensures that uncompensated work is not being performed by its nurses. The Code of Federal Regulations is explicit about this:

> <u>[I]t is the duty of the management</u> to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R § 785.13 (emphasis added). <u>See also</u> <u>Walton v. United Consumers Club, Inc.</u>, 786 F.2d 303, 314-15 (7th Cir. 1986) (because the FLSA requires "every employer to keep an accurate record of hours worked by each employee" the employer, rather than the employees, must suffer the consequences of inaccurate time sheets); <u>see also</u> <u>Ladegaard v. Hard Rock Concrete Cutters, Inc.</u>, 2004 U.S. Dist. LEXIS 16288, *12, No. 00-c-5755 (N.D. Ill. Aug. 18, 2004) (an employer cannot "escape its responsibility to pay employees for all time worked by relying solely on the hours reported on employees' time sheets"). The "employer's duty under the

25

FLSA to maintain accurate records of its employees' hours is non-delegable." <u>Kuebel v. Black & Decker Inc</u>., 643 F.3d 352, 363 (2d Cir. 2011)(<u>citing</u> 29 U.S.C. § 211(c) and <u>Caserta v. Home Lines Agency, Inc.</u>, 273 F.2d 943, 944, 946 (2d Cir. 1959) (rejecting as inconsistent with the FLSA an employer's contention that its employee was precluded from claiming overtime not shown on his own timesheets, because an employer "cannot . . . transfer his statutory burdens of accurate record keeping, and of appropriate payment, to the employee" (citation omitted))).

Defendant's implementation of its automatic meal period deduction policy is notably lacking in mechanisms to ensure compliance. Instead of monitoring breaks to ensure a lack of interruption, or providing the Plaintiff with a space where they may not be interrupted, Defendant has made sure that its nurses be found and interrupted at all times, even on their breaks. (PFOF ¶¶22, 23, 38, 65, 74, 78, 85, 88). To do so, Defendant has required its nurses to remain on the premises and has provided its nurses with beepers and even uses its public address system to remain in constant reach of its nurses. (PFOF ¶¶65, 32, 35).

Defendant has placed the entire burden to accurately track and record work time on the Plaintiff and her co-workers, while at the same time making clear that work hours and overtime are to be kept to a minimum. Defendant has done so rather than accepting that burden itself, as the law requires. Defendant cannot now benefit by hiding behind a policy that put the responsibility on employees to correct Defendant's imprecise time-keeping. <u>DeMarco v. Northwestern Mem. Healthcare</u>, 2011 U.S. Dist. LEXIS 88541, *12 (N.D. Ill. Aug. 10, 2011) (<u>citing Skelton v. Am.</u>

26

<u>Intercontinental Univ. Online</u>, 382 F. Supp. 2d 1068, 1072 (N.D. Ill. 2005)(holding that employer "cannot hide behind a policy of having employees keep their own time to avoid compensating the employees for all overtime hours worked, including unrecorded hours.")).

To be sure, Defendant and Defendant only benefited from this time keeping policy. By ensuring that all breaks were automatically deducted, Defendant avoided a situation where a nurse may be paid for not working. Instead, nurses are not paid for every break they are not working <u>and</u> not paid for some breaks where they are working, but forget to or are unable to cancel their meal period. Such a practice is not what is contemplated by 29 C.F.R § 785.13 and unduly benefits the employer by providing it with uncompensated work.

Defendant knew that its policy requiring nurses to take a thirty minute uninterrupted meal break was unattainable. Despite this, it expected compliance and it improperly placed the responsibility on the employees to implement practices making daily adherence possible. Due to "the nature of the job," Defendant is "not surprised" that nurses, like the Plaintiff, have problems taking a full lunch uninterrupted. (PFOF ¶78). Defendant also knew that nurses remained on the premises over their meal period because they had to respond to Code Blues. (PFOF ¶¶24, 35, 38, 42).  Defendant further knew that nurses kept their beepers on them over their meal period, and that nurses were interrupted during their meal periods. (PFOF ¶¶67-73, 76, 83-86, 88-89). Despite Defendant's knowledge, Defendant paid its nurses a half-an-hour less than the time they were working at the facility, and

27

then placed the burden on the employees to affirmatively notify Defendant otherwise. This is inapposite to federal law.

Defendant is not relieved of its FLSA obligations simply by giving the Plaintiff the option to cancel the automatic thirty-minute deduction from her pay. Defendant was required to exercise its control by either (1) seeing to it that nurses were completely relieved of work for thirty minutes each work shift or (2) closely monitoring the time-records so that nurses were compensated for all hours worked. In this case, Defendant did neither. Now, to the extent Defendant's time records and payroll information is inaccurate, Defendant must suffer the consequences. Ladegaard, 2004 U.S. Dist. LEXIS 16288 at *13 (stating it's the employer's duty to keep accurate records of all hours worked, so "any time an employee spent performing principal activities is covered by the statutes whether or not the employee reported the time on his time sheet.")

### B. Under the FLSA Defendant Must Only Have Constructive Knowledge That It is Suffering and Permitting Employees to Perform Uncompensated Work

An element of any FLSA claim is proof that Defendant had actual or constructive knowledge that its employees performed uncompensated work.[9] See, e.g., Chao v. Gotham Registry, Inc., 514 F.3d 280, 287 (2nd Cir. 2008). Compensable work time includes "work not requested but suffered or permitted." 29 C.F.R. §

---

[9] Defendant's knowledge of Plaintiff's adherence to its "valid pay policies" is not the proper inquiry for FLSA purposes. (See D's Motion for Summary Judgment at 7). Regardless of the validity of Defendant's policies or Plaintiff's adherence to the same, Plaintiff simply must offer proof that Defendant had reason to know she was performing work for which she was not fully compensated. Reich, 28 F. Supp. at 1082.

785.11. The "reason [for the work] is immaterial;" so long as the employer has reason to believe the employee has continued to work, the time is working time. Id.

An employer who instructs its employees not to perform certain work is subject to liability under the FLSA where the employer knows its instructions are disregarded. See, e.g. Reich v. Stewart, 121 F.3d 400 (8th Cir. 1997)("the key inquiry is not whether overtime work was authorized, but whether [defendant] was aware that [plaintiff] was performing such work"); Reich v. Dep't of Conservation and Natural Res., 28 F.3d 1076, 1082 (11th Cir. 1994) (holding that an employer is not insulated from liability simply by "the promulgation of [a policy], coupled with the ability of some [employees] to comply"), Torres v. Gristede's Operating Corp., 628 F. Supp. 2d 447, 463 (S.D.N.Y. 2008).

Where an employer does not closely examine time records to note inconsistencies between time reported and the actual work load, the employer is not excused from being charged with constructive notice. Reich, 28 F.3d at 1082. So long as "there are unresolved issues regarding the employer's actual or constructive knowledge," summary judgment is not appropriate. Brennan v. Qwest Commc'ns Int'l, Inc., No. 07-2024 ADM/JSM, 727 F. Supp. 2d 751, 760 (D. Minn. 2010) (citing Robertson v. Board of County Comm'rs, 78 F. Supp. 2d 1142, 1158 (D. Colo. 1999)).

C.    **A Material Issue of Factual Dispute Exists Because Defendant Had Actual And Constructive Knowledge that the Plaintiff Performed Uncompensated Work Off-The-Clock**

Defendant offers two arguments for its lack of knowledge: (1) the Plaintiff allegedly "failed to inform the Hospital that she was not paid" and (2) the Plaintiff

29

sometimes complied with the Hospital's formal policies by cancelling the automatic deduction, so Defendant had no reason to know that there were also times when she did not cancel and should have been compensated for her work. Identical arguments have failed at the summary judgment stage in automatic meal break deduction cases. See DeMarco v. Northwestern Mem. Healthcare, 2011 U.S. Dist. LEXIS 88541, *11 (N.D. Ill. August 10, 2011) (rejecting defendant's arguments that it lacked knowledge of a nurse's off-the-clock work because its formal policies were valid and because the plaintiff had the opportunity to cancel deductions when her breaks were interrupted but she failed to do so). Simply urging nurses to comply with the formal overtime policies is insufficient for FLSA compliance. Id. at *15. When an employer has reason to know its policy is being disregarded, the employer is subject to liability. Id. (citations omitted).

Defendant's contention that it had "no reason" to believe that the Plaintiff and her fellow nurses were performing work during their meal breaks without receiving pay for their work is disingenuous. Moreover, this contention conflicts with the Plaintiff's substantial evidence to the contrary. (PFOF ¶¶24, 35, 38, 42, 48, 50, 70-73, 76-77, 78, 83-86, 88-89). Defendant knew that the Plaintiff and her fellow nurses were unable to leave the premises at any time during their shift. (PFOF ¶¶22, 24, 38, 42, 43). Defendant knew that the Plaintiff and her coworkers were unable to take unrestricted meal breaks, and that they were consistently subject to interruptions. (PFOF ¶¶68, 70, 71-74, 76-77, 83-88).

30

Defendant knew this because its unit directors held staff meetings during which they addressed consistent challenges in the work environment preventing nurses, including the Plaintiff, from taking meal breaks. (PFOF ¶¶71-73, 84). Nurses  complained to management that "every shift was short staffed," they were "tired of not having a meal break," that they  "often [sat] in the back room with lunch on [their] knees and [ate] real quickly," that they didn't even "have the opportunity to leave the unit and go to the cafeteria anymore," that "others [weren't] willing to help others take a break, take pager or phone because of their attitude or [were] just overworked themselves," and "a lot of people work overtime to chip in." (PFOF ¶84).

Finally, Defendant should have known that the Plaintiff was not cancelling all meal period deductions during which she was interrupted. This is so because Defendant was aware or should have been aware of the frequency of the interruptions that its nurses faced. (PFOF ¶¶48, 50). As such, Defendant knew or should have known that it was impractical or simply impossible for its nurses to cancel all meal period deductions during which they were interrupted.

Despite Defendant's knowledge that the Plaintiff and her fellow nurses worked straight through shifts while being paid for a half-an-hour less time, Defendant's sole corrective action was to reiterate its policy that nurses are entitled to a thirty-minute meal break during their shift. Such a "hands-off" approach does not relieve an employer of its obligations under the FLSA. See, e.g., Reich, 28 F.3d at 1083 (defendant "had a duty to do more than to simply continue to apprise the

31

[employees] of the policy" when it had imputed knowledge that the policy was not being followed), <u>Torres v. Gristede's Operating Corp.</u>, 628 F. Supp. 2d 447, 463 (S.D.N.Y. 2009) (where defendant took "only minimal measures to ensure compliance" with its overtime policy, defendant was liable), <u>Skelton v. Am. Intercontinental Univ. Online</u>, 382 F. Supp. 2d 1068, 1072 (N.D. Ill. 2005)(an employer "cannot hide behind a policy of having employees keep their own time to avoid compensating the employees for all overtime hours worked, including unrecorded hours.") (citations omitted). Rather, Defendant's failure to ensure employee compliance with its written policies, and to a greater extent its failure to meet its own obligations under federal wage and hour law, establishes Defendant's liability.

For the these reasons, Plaintiff puts forth more than sufficient evidence for a reasonable factfinder to conclude that Defendant did have actual, or at a minimum, constructive knowledge that Plaintiff incurred deductions from her pay at times when she worked through her thirty-minute meal break or was subject to interruptions during her meal period. As such, summary judgment is not appropriate.

### i.    Defendant Knew that the Plaintiff And Her Coworkers Were Unable to Take Unrestricted Thirty-Minute Meal Breaks Because They Were Consistently Subject to Interruptions.

When an employer implements an automatic meal period deduction for each shift, it is the <u>employer's</u> responsibility to ensure that its employees take the 30-minute meal break without interruption. <u>See</u> Wage and Hour Division, U.S. Dep't of

Labor, <u>Factsheet No. 53 –The Health Care Indus. & Hours Worked</u> (2008).

Defendant knew that Plaintiff had to take her beeper on her meal break, was

interrupted during her meal break, and was, at times, too busy to get a meal break

at all. (PFOF ¶¶70, 73, 76, 83). Despite Defendant's knowledge, it did not ensure

that the Plaintiff was compensated for all times she was denied a full thirty-minute

uninterrupted meal period. Summary judgment is not appropriate in such an

instance. <u>See</u> <u>Valcho v. Dallas County Hosp. Dist.</u>, 658 F, Supp. 2d 802, 812-813

(N.D. Tex. 2009) (denying summary judgment in a nurses meal break case where it

was a practice for nurses to work through meal periods, nurses and managers often

interrupted plaintiff during her meal periods, and she was required to immediately

respond to her pager).

> **a.    Defendant Received Various Complaints Regarding Beeper Use Over Meal Periods And Did Not Correct The Problem.**

While working, the Plaintiff was required to keep her beeper with her in

order to receive pages related to her patients, including doctor calls, messages from

charge nurses, or other patient needs. (PFOF ¶65). St. Mary's advised nurses to

hand their beepers off to another nurse while they went on break. (PFOF ¶66).

Notwithstanding this instruction, nurses were not always available to accept

Plaintiff's beeper while she took her break. Thus, many nurses, Plaintiff included,

took their beepers with them while they ate. (PFOF ¶68; Fosbinder-Bittorf Depo. at

122 ("[nurses] would announce that . . . they weren't going to pass off their beeper

and that that would be considered their break"); Bratten Depo. at 57 ("[nurses] kept

their beepers with them and went into the break room"); Mannina Depo. at 60 ("We would sometimes try to take our break on the floor, holding our pager if we knew that a doctor needed to do a procedure"), Myers Depo. at 82("I can almost always remember having my cell phone with me [while I ate]"). When this happened, the Plaintiff was subject to and was interrupted by her beeper while on break. (PFOF ¶69). The Plaintiff complained to her unit director and to human resources about not being able to hand her beeper off while on break. (PFOF ¶70).

Defendant knew that carrying a beeper while on break was not simply an isolated occurrence for the Plaintiff. In multiple staff meetings, Defendant, through its unit director, recognized that "people are still taking beepers on breaks." (PFOF ¶71). Nurses were refusing to accept beepers, nurses were unable to accept beepers because they already had too many to monitor, and some nurses were too busy to give up their beeper and go on a break, so they took their beeper with them while they ate quickly. (PFOF ¶72). The Plaintiff and other nurses in her unit complained that understaffing contributed to their failure to hand off their beepers. (PFOF ¶73).

Upon learning that nurses were not getting full meal breaks, Defendant's only "follow-up" action was to remind nurses "it is expected that everyone receive an uninterrupted 30 minutes break from the floor." (PFOF ¶92). Defendant never instructed the Plaintiff or her colleagues to review their time cards and to retroactively cancel all deductions for all dates they were interrupted by pages. (PFOF ¶94). Defendant never implemented a consistent break schedule that

34

ensured there would be someone available to whom Plaintiff could give her beeper at the proper time. (PFOF ¶97). Defendant did not keep a unit director on all shifts to administer the break schedules. (PFOF ¶98). Defendant never increased staffing on the Plaintiff's unit to cover her patients while she went on break. (PFOF ¶99). To the contrary, Defendant encouraged keeping staff levels to a minimum and discouraged overtime. (PFOF ¶¶101, 102, 104). Plaintiff and her coworkers were simply supposed to help each other out by holding on to each other's beepers. (PFOF ¶66).

Defendant did not properly exercise its control to ensure that nurses did not perform work on their meal periods, and as such, it can be charged with constructive knowledge. See Demarco, 2011 U.S. Dist. LEXIS 88541 at *11-12 ("Defendant essentially asks: If a large employer allows its employees to record their own time, how can it be liable for failing to pay overtime when a particular employee did not record all the time she worked? And if [plaintiff] did not record all of her work time, isn't that her fault rather than defendant's? The law answers those questions in [plaintiff's] favor.")

While Defendant would like to receive the benefit of free work by implementing its auto-deduction policy and allowing its employees to work during their unpaid meal periods, the FLSA does not permit Defendant to do so. Defendant was aware that it was the beneficiary of unpaid work and, as such, summary judgment cannot be granted in its favor.

**b.   Defendant Knew, or Should Have Known, That if the Plaintiff and The Nurses On Her Unit Received a Meal Break At All, They Were Frequently Interrupted.**

The Plaintiff and her colleagues occasionally ate their meals in the break room on their floor instead of going to the cafeteria. On these occasions, the Plaintiff was more often than not interrupted by doctors, nurses, family members, and calls from persons who needed to speak with the treating nurse. (PFOF ¶¶74, 75). In fact, Plaintiff's unit director saw her eating in the break room and interrupted her with work related inquiries such as such as shift switches, attendance and written correspondence. (PFOF ¶¶76, 77). Plaintiff's interruptions lasted a range of time, from a few minutes to the whole break. (PFOF ¶79). When her meal period was less than thirty minutes long, Plaintiff did not cancel the thirty minute deduction. (PFOF ¶80). She was told that if you got a meal break, regardless of the length, "that was your break." (PFOF ¶82). Missed meal periods happened so frequently, that if nurses ate anything, it was considered a meal, and they did not cancel. (PFOF ¶90).

Plaintiff complained both to her supervisor, Unit Director Kandace Harrison, and to Human Resources Representative Rhondi Dorshorst about having to work over her meal period. (PFOF ¶83). Due to the heavy work load nurses were too busy to take breaks. (Id.). Ms. Dorshorst stated that these were issues that needed to be addressed on Plaintiff's unit. (Id.).

Those issues were, in fact, discussed on the Plaintiff's unit and with Plaintiff's Unit Director both on an individual level and during staff meetings.

36

(PFOF ¶¶71-73, 83, 84). Despite this, during the entirety of the Plaintiff's employment, the work conditions never changed. (PFOF ¶¶93-99). Beyond the Plaintiff's own complaints, multiple nurses on the Plaintiff's unit complained to management that "every shift was short staffed," they were "tired of not having a meal break," that they "often sit in the back room with lunch on [their] knees and [eat] real quickly," that they don't even "have the opportunity to leave the unit and go to the cafeteria anymore," that "others aren't willing to help others take a break, take pager or phone because of their attitude or are just overworked themselves," "a lot of people work overtime to chip in." (PFOF ¶84).

Similar to the Plaintiff's experience on her unit, the nurses on Defendant's other units frequently were subject to interruptions during their breaks. Approximately fifty percent of the time, Ms. Mannina took her meal period in the break room. (PFOF ¶85). During her meal period she caught up on her charting, had in-services, or was interrupted by doctors or patient's family members. (Id.). Ms. Mannina's supervisor also ate with her in the report room on a few occasions. (PFOF ¶86).

Ms. Bratten also was subject to interruptions during her meal period that lasted anywhere from five minutes to the whole meal period. (PFOF ¶87). Ms. Myers complained to her Unit Director that due to understaffing and the needs on the floor, "it was almost impossible to get 30 minutes of uninterrupted lunch." (PFOF ¶88). Ms. Myers was even interrupted by her Unit Director while eating her

meal, but the Unit Director did not instruct Ms. Myers to cancel the meal period deduction. (PFOF ¶89).

Notwithstanding Defendant's knowledge that interruptions were a problem, it never instructed the Plaintiff on what constituted a full meal break and what she should do if her meal period was interrupted, especially at times when the meal was interrupted more than halfway through. (PFOF ¶¶95, 96, 100).

Adequate evidence in the factual record support that Defendant had actual knowledge, and at a minimum, constructive knowledge, that the Plaintiff and her coworkers regularly were interrupted during or worked through meal periods which were uncompensated. As such, summary judgment on the Plaintiff's FLSA claims is precluded.

        **c.**     **Defendant Knew, Or Should Have Known, That the Plaintiff Was Not Cancelling All Deductions For All Meal Periods That She Worked**

Defendant had constructive knowledge of the Plaintiff's unpaid meal breaks as Defendant had access to the cancellation data. Had Defendant exercised reasonable diligence, it would have known that its nurses, including the Plaintiff, worked during more meal periods than those meal periods that they canceled. Instead, Defendant avoided gathering accurate information and, through its policies, continued to encourage minimal cancelations. Knowledge is imputed to an employer when, such as the case here, defendant failed to investigate the conditions of the hospital's operation. <u>Reich</u>, 28 F.3d at 1083-1084.

ii.     **Defendant Had Actual Knowledge of Uncompensated Work as It Reviewed The Frequency With Which the Plaintiff Cancelled The Automatic Meal Period Deduction.**

Management at St. Mary's had full access to, and was expected to review, employee timecards at the end of each pay period. (PFOF ¶¶48, 50). Managers were trained to review all time cards in order to verify the accuracy of employees' work time. (PFOF ¶¶48-50.). Management also reviewed exceptions, such as the "cancel deduct" exception, in order to see how many times an employee canceled the automatic deduction during any particular time period. (PFOF ¶51).

The Plaintiff's Supervisor knew that the Plaintiff was not cancelling all of her meal break deductions, despite the fact that the Plaintiff did not leave St. Mary's premises over her break and despite her complaints that she was unable to consistently take a meal break. (PFOF ¶¶25, 70, 73, 83). In fact, the Plaintiff only cancelled seven percent of the automatic deductions, despite the frequent interruptions. (PFOF ¶64).

Defendant was required to exercise reasonable diligence to acquire knowledge as to the frequency with which the Plaintiff and her coworkers worked through their meal periods. It did not do so. If Defendant had done so, it would have known that they were not being paid for all hours worked. (PFOF ¶63).Thus, as a matter of law, Defendant must minimally be charged with having constructive knowledge. See Brennan v. General Motors Acceptance Corp., 482 F.2d 825, 827-828 (5th Cir. 1973) (affirming judgment in favor of plaintiffs where, through

39

reasonable diligence, the immediate supervisors could have obtained information regarding unpaid overtime).

Because Defendant was well aware of the frequency at which meal breaks were interrupted and had access to meal break cancellation data, it is apparent that it allowed uncompensated work to continue despite its knowledge of that work. The factual record demonstrates that Defendant had actual or constructive knowledge of uncompensated work. As such, summary judgment on the Plaintiff's FLSA claims is inappropriate.

### iii.   Plaintiff's Underreporting Was the Result of Defendant's Policies.

Defendant appears to suggest that the Plaintiff cannot recover her FLSA claim because it was her own fault for failing to record all the time she worked. This is not so. It is the employer's duty to keep accurate time sheets. Walton v. United Consumers Club, Inc., 786 F.2d at 314-15. Summary judgment is inappropriate where inaccuracies in the time records are not solely due to plaintiff's deliberate failure to accurately record hours, but also due to the employer's expectations and rules. See Brennan, 727 F. Supp. 2d at 759, 762 (plaintiffs presented evidence that they performed off-the-clock work to comply with defendant's "out-of-the-garage" rule, creating an inference that defendant should have known of plaintiffs' under-reporting of work hours).

Here, the Plaintiff did not consciously fail to report all her hours worked, as the Defendant suggests. Rather, the Plaintiff's underreporting was the result of

40

hospital policies.  Nurses were not capable of taking thirty minute unrestricted breaks because the hospital was consistently understaffed and because they had to be available to respond to patient needs. (PFOF ¶¶73, 75, 84, 85, 87, 88, 90). Notwithstanding the hospital's demands, management told nurses to avoid incurring overtime. (PFOF ¶¶101-104). Pressure from immediate supervisors not to incur overtime is enough to impute knowledge to the employer that the employees are underreporting. Brennan v. General Motors Acceptance Corp., 482 F.2d 825, 828 (5th Cir. 1973).

When reviewing nurses' time records, management was to make sure that overtime was minimized. (PFOF ¶49). The Plaintiff's supervisors instructed her that overtime was to be kept to a minimum. (PFOF ¶101). The Plaintiff's Unit Director reported to the Plaintiff's unit that their goal was to keep overtime to less than two percent. (PFOF ¶102). Nurses understood that they would be disciplined if they continued to incur overtime (PFOF ¶103). Managers knew that overtime was the result of understaffing, but they still told nurses not to incur overtime. (PFOF ¶104). Because of this, nurses did not cancel every meal they missed, as paid meal periods would result in overtime. (PFOF ¶63).

Additionally, the Plaintiff and her coworkers did not understand fully the meal break activities that required remuneration. (PFOF ¶100). There is no indication in the record that Defendant offered any training on the type of interruption which would require a meal period cancellation. (PFOF ¶¶93-96). Further, it is clear that Defendant never informed its nurses that meal periods

during which they were unable to leave the facility are compensable under Wisconsin law. (PFOF ¶¶24, 26, 42, 63, 64, 100).

Other than reiterating that nurses are entitled to an unrestricted thirty minute meal break, the Plaintiff's supervisors never instructed her on the specifics of what "unrestricted" meant. (PFOF ¶¶92, 95). They never explained to Plaintiff that she should cancel the meal period deduction even when she received a twenty minute break, but then it was interrupted. (PFOF ¶96). It was understood that if a nurse got a break, no matter how long, "that was her break" and the deduction should not be canceled. (PFOF ¶82). Nurses did not cancel every automatic deduction for every meal they missed, and they did not understand the types of activities that constituted work time for purposes of canceling the deduction. (PFOF ¶¶63, 100).

The Plaintiff did not consciously omit overtime hours for which she knew she could be paid, nor did her acts prevent Defendant from acquiring knowledge of her work. She was required to remain on the premises during her meal periods, and she told her managers that she was unable to take uninterrupted meal breaks. Her supervisors knew, at least constructively, that over three years, she canceled the deduction only 7% of the time, and they knew of the hospital-wide inability of nurses to take meal breaks. Nonetheless, management did not correct the meal break problem, it did not closely monitor employees' payroll in order to ensure full compensation, and continued to instruct nurses not to incur overtime. This evidence

is sufficient evidence to raise a genuine issue of material fact regarding Defendant's actual or constructive knowledge. <u>DeMarco</u>, 2011 U.S. Dist. LEXIS 88541 at *9-10.

### iv.   The Cases Defendant Relies On Are Factually Distinct From This Case

Defendant relies on a line of cases which lack essential elements present in this case. In the cases cited by Defendant 1) the defendant did not maintain a policy which caused its employees to work off the clock and 2) the defendant did not know and had no way of knowing that off the clock work was being performed. Here, Defendant was well aware that its policies were impacting all nurses as these nurses lodged complaints with Defendant about uncompensated work. Further, Defendant was aware of work load and staffing issues which lead to the performance of uncompensated work during unpaid meal periods, and had reason to believe that uncompensated work was being performed.

In <u>Kellar v. Summit Seating Inc.</u>, without the telling her employer, the Plaintiff elected to come in before the start of her scheduled shift and to perform work without pay. 664 F.3d 169 (7th Cir. 2011). The court found that because other employees customary arrived early, but did not perform work, it had no reason to suspect that the plaintiff was performing work when she arrived early. <u>Id.</u> at 18. The plaintiff never indicated to management that she was working off the clock, and she would complete timecards misstating the time that she allegedly began working. <u>Id.</u> Unlike the plaintiff in <u>Kellar</u>, Defendant had every reason to believe that its nurses were performing off the clock work.  Complaints about understaffing

and working through meal periods were lodged at staff meetings, led by Unit Directors. Defendant was aware that interruptions regularly occurred during meal periods, but did precious little to ensure that meal periods were uninterrupted. In fact, Defendant made sure that its nurses could be interrupted during meal period by requiring them to remain on site and using a PA systems as well as beepers to call nurses back to the floor when needed.

Additionally, Kellar did not deal with an automatic deduction policy implemented by the employer. Implementation of such a policy puts Defendant on notice that, if not closely monitored, uncompensated work may be performed on its behalf. Defendant had duty to ensure that its nurses were not performing work during uncompensated time because it chose to deduct meal periods from pay. No similar obligations existed in Kellar because the off the clock work performed in that case did not result from an employment implemented auto deduction policy.

The bulk of the remaining cases relied on by Defendant similarly do not involve employer policies that commonly caused employees to perform uncompensated work. See e.g., Bjorndson v. Daido Metal USA, Inc., 12 F. Supp. 2d 837 (N.D. Ill. 1998) (there were no defects in the employer's recordkeeping system and the employee was unable to prove that his time records were inaccurate). Rather, the cases cited by Defendant involved an individual employee who deliberately turned in inaccurate time records, and the employer had no reason to know of the employee's additional unreported work. See Wood v. Mid-America Mgmt. Corp., 192 Fed. Appx. 378, 380-381 (6th Cir. Ohio 2006) (employer could

44

have no reason to know that the individual "consciously omit[ed] hours for which he knew he could be paid"); see also McKnight v. Kimberly Clark Corp., 149 F.3d 1125 (10th Cir. 1998), Brumbelow v. Quality Mills, Inc., 462 F.2d 1324 (5th Cir. 1997) ("on the narrow facts of this case . . . the appellant was estopped and could not profit from her own wrong in furnishing false data to the employer"), Newton v. City of Henderson, 47 F.3d 746, 749-50 (5th Cir. 1995), Whitaker v. Pacific Enterprises Oil Co., 1992 U.S. App. LEXIS 5135 (10th Cir. 1992), Forrester v. Roth 's IGA Foodliner, 646 F.2d 413, 414-15 (9th Cir. 1981), Seever v. Carrols Corp., 528 F. Supp. 2d 159, 170 (W.D.N.Y. 2007), Vince v. Ill. Cent. Sch. Bus LLC, No, 09-5360, 2011 U.S. Dist. LEXIS 12858, *34- 37 (N.D. Ill. Feb. 9, 2011) (there were no material facts creating a reasonable inference that the individual employee actually worked overtime hours).

Here, the Plaintiff did not deliberately attempt to deceive Defendant regarding the amount of time she worked. Instead, as the record reveals, the Plaintiff and other nurses made Defendant aware that its meal break policy was causing them to have to work off the clock. The impossibility of canceling every missed or interrupted meal period does not suggest that the Plaintiff or her coworkers were attempting to the deceive Defendant; instead it suggests that Defendant failed to create work conditions that would allow proper implementation of an automatic meal deduction policy. The cases relied on by Defendant deal only with instances of individual concealing work from their employer or affirmatively misleading the employer about the amount of time worked. These cases do speak to

45

the situation where Defendant had knowledge that its common policy was resulting in uncompensated work.

Defendant also relies on <u>Frye v. Baptist Memorial Hosp.</u>, 2011 U.S. Dist. LEXIS 45605 (W.D. Tenn. 2011) to support its argument that its alleged lack of knowledge is a shield to liability. First, this case did not deal with the "actual or constructive" knowledge requirement of the FLSA's suffer or permit standard. Id. at *24-5. Instead, that case dealt with a separate question entirely. The FLSA extends the statute of limitations from two to three years when the violation is "willful." <u>Id.</u> A willful violation is one where a defendant "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 133 (1988). The court's order in <u>Frye</u> found that the plaintiff had not met its burden to prove willfulness and to extend the statute of limitations. 2011 U.S. Dist. LEXIS 45605 at *30.

While Defendant's actual knowledge may support a willful violation, it is a separate question from whether it suffered and permitted work to be performed. If the court in <u>Frye</u> considered whether the plaintiff was suffered and permitted to work (which it was not), the case lacked many of the factual elements presented here. In the present case, the Plaintiff has shown that, through meetings and individual complaints, Defendant was well aware that nurses had difficultly and were often unable to take uninterrupted meal periods. Defendant had further reasons to believe that nurses could not feasibly cancel every interrupted meal period, but it not did check to see if nurses were doing so.

46

Finally, Defendant's reliance on <u>Barefield v. Village of Winnetka</u>, 81 F.3d 704 (7th Cir. 1996) to suggest that the Plaintiff's meal periods were non-compensable is misplaced. Defendant admits that the Plaintiff was not paid for meal periods during which she worked. [10] As such, Defendant's reliance seems to advance an argument it has already waived.  Additionally, Defendant misconstrues the Plaintiff's allegations to attempt to fit them within the facts of <u>Barefield</u>. In <u>Barefield</u>, the Plaintiffs' only allegations of work during meal periods were that they had to monitor a radio and could not leave the building. <u>Id.</u> at. 14. The Plaintiff's allegation are quite different. She alleges that she worked through entire meal periods for which she was not paid. (PFOF ¶12, 91). Further, she alleges that doctors, family members, and other nurses would find her and cut her lunch period short. (PFOF ¶75). The Plaintiff does not, as the plaintiffs in <u>Barefield</u> did, allege that merely having to listen to the PA system was enough to render their meal periods compensable. The Plaintiff alleges, and Defendant admits, that the Plaintiff performed work during meal periods for which she was provided no compensation. (PFOF ¶¶24, 37, 68-73, 76, 78, 80, 83, 91).

The cases on which Defendant relies are not helpful to the Court in deciding the instant motion. These cases deal with individuals performing off the clock work which Defendant could not discover was occurring without extraordinary effort. Here, the Plaintiff and her coworkers were subject to a common policy which caused

---

[10] In Defendant's moving papers, it states "[f]or the purposes of this Motion for Summary Judgment, the Hospital will assume that Plaintiff was not paid for some meal periods when she worked due to her failure to cancel the meal period deduction, but reserves the right to challenge that allegation later, if necessary." (Defendant's Brief at n.2).

them to work off the clock. They complained to Defendant on numerous occasions that work was being performed during uncompensated meal periods. Defendant was aware of its meal period policy and was aware that work was being performed as a result of that policy.

In sum, the factual record is rife with evidence that Defendant had actual knowledge that its nurses, including the Plaintiff, were performing uncompensated work. Additionally, because Defendant implemented an automatic meal break deduction policy, it had an obligation to ensure that no work was being performed. If Defendant was truly unaware that work was being performed, which is quite unlikely, its ignorance was due to its failure to properly monitor the conditions of employment after implementation of its automatic deduction policy. As such, factual disputes do exist with regard to Defendant's knowledge of uncompensated work which preclude summary judgment on the Plaintiff's FLSA claims.

## CONCLUSION

Defendant's early motion for summary judgment seeks an extreme remedy, prior to the full development of the factual record. While discovery in this case has only been open for a few months, the record includes more than sufficient evidence to establish factual disputes concerning both Plaintiff's claims under Wisconsin law and the FLSA.

Defendant readily admits that the Plaintiff performed uncompensated work on its behalf. This work was performed under an automatic meal break deduction policy implemented despite the fact that nurses are frequently subject to

48

interruptions during meal periods and despite the fact that they could not leave the facility during their meal periods. Defendant received the benefit of free labor from this policy, and failed to ensure that its nurses would be compensated for all work performed. As such, Defendant's motion for summary judgment on Plaintiff's FLSA claims fails.

Beyond this, unrefuted evidence reveals that the Plaintiff and her coworkers virtually never left St. Mary's Hospital during unpaid meal periods. Nearly a million time clock entries for more than 1,000 nurses confirm that nurses remained on site for virtually every meal period deducted from their pay. Defendant's suggestion that they chose to remain on site or somehow collectively misunderstood Defendant's policy is implausible and not supported by fact.

As such, Defendant's motion for summary judgment on Plaintiff's Wisconsin law claims fails as well. For all of the above state reasons, summary judgment on the Plaintiff's claims cannot be granted.

49

Dated: February 21, 2012.

HAWKS QUINDEL, S.C.

By:   */s/ William Parsons*
     William E. Parsons, State Bar No. 1048594
     Email: wparsons@hq.law.com
     David C. Zoeller, State Bar No. 1052017
     Email: dzoeller@hq-law.com
     Danielle M. Schroder, State Bar No. 1079870
     Email: dschroder@hq-law.com
     Post Office Box 2155
     Madison, Wisconsin 53701-2155
     Telephone:  608/257-0040
     Facsimile: 608/256-0236

     Attorneys for the Plaintiff