IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROBERTA FOSBINDER-BITTORF,
individually and on behalf of all
others similarly situated

                     Plaintiff,                  OPINION AND ORDER

   v.

                                                                   11-cv-592-wmc

SSM HEALTH CARE OF WISCONSIN, INC.,

                     Defendant.

---

       In this hybrid class and collective action under the Fair Labor Standards Act, 29 U.S.C. §§ 206 & 207, and Wisconsin state law, named plaintiff Roberta Fosbinder-Bittorf alleges that defendant SSM Health Care of Wisconsin, Inc. allowed nurses at St. Mary's Hospital to work during their meal periods without pay. Now before the court is SSM Health Care's motion for summary judgment against Fosbinder-Bittorf (dkt. #69).

       Because Fosbinder-Bittorf presented evidence that nurses in her unit were required to remain on the premises during their meal periods, which may be sufficient to render all her meal periods compensable under Wisconsin state law, I will deny SSM Health Care's motion for summary judgment on her state law claim. Under the FLSA, SSM Health Care is liable to Fosbinder-Bittorf only if it knew or had reason to know that she was regularly performing uncompensated work during her meal periods, which depends, in part, on whether it had reason to know that many nurses were doing so. Because the latter question requires further class-wide factual development, I will deny without prejudice SSM Health Care's motion for summary judgment on her FLSA claims.

## UNDISPUTED FACTS[1]

### A. The Parties

Defendant SSM Health Care of Wisconsin, Inc. is a corporation consisting of a number of hospitals, including St. Mary's Hospital ("St. Mary's"), a medical care center in Madison, Wisconsin. St. Mary's employs around 1000 nurses. Plaintiff Roberta Fosbinder-Bittorf was employed as a registered nurse at St. Mary's from July 10, 2006 until July 29, 2011. She typically worked in the Medical/Surgical Care Unit, but also worked as a "mobile" or "float" nurse on other units. St. Mary's paid Fosbinder-Bittorf at an hourly rate, based on the time that she swiped her card in and out of the hospital's Kronos time clock. In a two-week pay period, she was generally scheduled to work eight shifts for eight hours each with her schedule changing from day to day between the night, evening and day shifts.

### B. St. Mary's Official Meal Policy

Like all of St. Mary's non-exempt nurses, Fosbinder-Bittorf was subject to an "automatic meal period deduction." St. Mary's deducted a thirty-minute meal period automatically from any shift in which a nurse worked over five and a half hours. In the event that the nurse did not receive an uninterrupted meal break, the nurse could cancel the deduction by pressing a "cancel lunch" button on the time clock or by completing a written "maintenance" sheet. Nurses had access to their time cards on the hospital's intranet and were supposed to review the time card's accuracy for each pay period.

---

[1] The following undisputed facts are drawn from the parties' proposed findings of fact, resolving all reasonably disputed facts and inferences in plaintiff's favor as the non-moving party.

2

St. Mary's written policy for meal and rest periods, which applies to all hospital employees, states:

> The meal period is a consecutive thirty minute unpaid period of time during which no work is performed. The meal period is normally scheduled midway through any shift of at least 5-1/2 hours or longer. The rest period consists of either two 10-minute or one 20-minute period of paid time. Employees who work five or more hours in a shift are eligible to receive this paid break time. At times, department/unit activity may restrict the availability of paid rest periods.
>
> Meal and rest periods are scheduled with the approval of your supervisor. Employees are required to remain on the hospital premises and be available for work during the paid rest period, but activities are typically unrestricted during the unpaid meal period.

Defendant's 30(b)(6) witness testified that he had "no idea" what "typically unrestricted" means in the meal policy but then added that it "relates . . . to unit by unit" differences or means "most of the time." (Brenhold Dep., dkt. #15, at 98:5-22.)

St. Mary's maintained a "Management Guide," which was available to all employees on the hospital's intranet and explained the meal period policy further, stating

> 1. Employees will take their usual 30 minute lunch break. If an employee is not allowed the full 30 minute uninterrupted lunch break due to work requirements, the full 30 minute period will be paid time. An Employee should cancel their meal at the Card Reader as soon as they know they will not be getting the 30 minute meal period by pressing F1 and presenting their badge when "Badge" appears.
>
> 2. If an employee works during the meal period (normally a five-minute or longer telephone conversation or any hands on work), the entire lunch period is considered work time. In this case, the employee needs to cancel their meal deduction in HRMIS.
>
> 3. Granting the 30-minute meal period is recommended, but

supervisors may decide to eliminate the meal period in special situations, i.e. night shift hours with no coverage available or other legitimate business reasons. If the meal period is not taken, the employee is to be paid.

4. Since the meal period is unrestricted activity, employees have the option to leave the hospital premises. However, if employees are expected to remain in the hospital during their meal periods, and choose to do so voluntarily, this is permissible as long as alternate coverage is made available, Should the employee wish to leave the building, she/he must notify the Nursing Administrative.

### C. Fosbinder-Bittorf's Work Experience

Fosbinder-Bittorf knew that St. Mary's handbook stated that employees were entitled to a thirty-minute meal break. She was trained about how use the hospital's time clock during her "new hire orientation." Between August 23, 2008, and July 29, 2011, she cancelled her meal break deduction 35 times. St. Mary's paid her each time she cancelled the meal deduction, and never questioned her on any occasion when she cancelled or noted a missed meal break.

Nevertheless, Fosbinder-Bittorf regularly missed or was interrupted during her meal break without cancelling the deduction or otherwise informing the hospital that she should have been paid. She frequently forgot to cancel the deduction on the Kronos clock because she was too busy. She would also forgot to note the missed meal breaks on a maintenance sheet or would be unable to recall the precise day when she missed the break. In addition, Fosbinder-Bittorf generally cancelled the deduction only when she did not have an opportunity to eat anything or take any break. She believed that she should not cancel the deduction when she took a quick meal break for less than 30

4

minutes or when her break was interrupted. During her orientation and "preceptorship," she observed that her preceptor and other charge nurses did not cancel the deduction when they took short meal breaks. (Fosbinder Dep., dkt. #18, at 120:5-122:11.) Her supervisors did not explain to her that she should still cancel the deduction despite having taken a 20 minute meal break that was cut short by an interruption.

Fosbinder-Bittorf meal break was never uninterrupted while she was working as a float nurse, but on the Medical/Surgical Care Unit she frequently missed or was interrupted during meal breaks. These interruptions varied in length from a few minutes to the entire break. She typically ate meals in the cafeteria but occasionally ate in the break room. When eating in the break room, she was interrupted by doctors, nurses, family members and other calls around 60% of the time. Fosbinder-Bittorf's unit director, Harrison, saw her eating meals in the break room and being interrupted with work questions; in fact, Harrison discussed work matters with Fosbinder-Bittorf during her meal break, including shift changes, attendance and written correspondence. Fosbinder-Bittorf's meal break was also occasionally interrupted by pages. The nurses in her unit were required to carry a beeper to receive pages related to their patients, such as doctor calls and messages from charge nurses. St. Mary's instructed nurses to pass their beepers to another nurse during their break, but nurses were not always available to accept beepers. Fosbinder-Bittorf and other nurses on her unit often took their beepers with them during meal breaks.

During her meal period, Fosbinder-Bittorf would eat and sometimes sleep, rest, talk on the phone or wander the hospital floors. She wanted to leave the hospital

premises but rarely, if ever, did because she feared being disciplined. While Fosbinder-Bittorf does not know of any hospital employee who was disciplined for leaving the premises during a meal break, when she began her employment at St. Mary's, her unit director, Mary Sutton, instructed her that she was not permitted to leave the premises during her lunch break.[2] (Fosbinder Dep., dkt. #18, 39:10-40:3.) Fosbinder-Bittorf's supervisors never told her that (1) she could leave or (2) she should cancel the meal deduction when she was required to stay.

Charge nurses also told Fosbinder-Bittorf that she was not permitted to leave the hospital premises during her meal period.[3] Charge nurses assigned nurses to patients for each shift and determined when nurses could take their meal breaks. St. Mary's considers charge nurses to be "patient care staff," rather than managers. They do not review time or payroll records and have no authority to hire, fire or discipline employees. Fosbinder-Bittorf knew that charge nurses could not hire or fire nurses, but did not know if they could formally discipline a nurse. She was never a charge nurse but did receive

---

[2] Defendant argues that plaintiff's testimony is insufficient to establish this fact. However, when defense counsel asked Fosbinder-Bittorf directly whether Sutton told her that she could not leave the premises for meals, she answered "yes." (Fosbinder Dep., dkt. #18, 39:10-25.) When pressed for details, she said that she "did not recall [Sutton's] exact words" and recounted instead Sutton's instructions about cancelling deductions for missed breaks. (Id. at 40:6-20, 40:21-25.) While perhaps relevant to her credibility, the latter testimony does not change the substance of her earlier answer.

[3] Defendant objects that the charge nurses' statements about its policies are hearsay and not party admissions because the Seventh Circuit concluded in *NLRB v. GranCare, Inc.*, 170 F.3d 662 (7th Cir. 1999), that charge nurses are not members of management. (Def.'s Br., dkt. #72, at 16-17; Def.'s Reply, dkt. #87, at 15.) *GranCare* does not state a general proposition that charge nurses are not managers; it merely affirmed the factual determination of the NLRB that the charge nurses in the case before it were not "supervisors" under the NLRA. Id. Moreover, an employee's statements are admissible against its employer if made "on a matter within the scope" of his or her employment relationship, Fed. R. Evid. 801(d)(2)(D), whether found to be a "manager" or not. Because charge nurses had authority to decide when or if other nurses took meal breaks, their statements about this policy appear to be within the scope of their employment. In any case, SSM Health Care waived this hearsay objection, at least for summary judgment purposes, by failing to develop it or cite relevant authority. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

charge nurse training and does not recall being told during training that nurses could not leave the premises for meals.

Fosbinder-Bittorf believed that St. Mary's required her to remain on the premises within earshot of the paging system, because she was required to return immediately to her floor if a "code blue" was called. A code blue signifies a situation where a patient is in imminent danger from cardiac or pulmonary arrest. According to the hospital's "Code Blue Plan," the "[registered nurse] responsible for the patient assists with the code, provides CPR and answers questions during the code. He/she is responsible to remain at the scene to provide pertinent patient information." When a code blue was called, nurses that are part of the code team and nurses on the particular unit were required to respond. The plan does not include an explicit exception for nurses or staff on meal breaks. Based on her experience as a nurse, her understanding of hospital policies and what she was told by charge nurses, Fosbinder-Bittorf believed it was imperative for the treating nurse to be available for a code blue, because the treating nurse is the most familiar with the patient's history and recent behaviors, symptoms and medication.

On one occasion, Fosbinder-Bittorf was eating a meal in the cafeteria and missed a code blue called on her floor. Afterward, a charge nurse lectured her for not responding to the code. The charge nurse said that "our policy is that when there's a code on the unit that [nurses] are to return to the unit and make ourselves available," regardless of whether they are on meal break. (Fosbinder Dep., dkt. #18, 139:17-19.) Fosbinder-Bittorf did not receive written discipline on this occasion.

Beginning in late 2007, Fosbinder-Bittorf's supervisor was Kandace Harrison.

7

Fosbinder-Bittorf's working hours overlapped with Harrison only when she worked the day shift, but she saw Harrison occasionally on other shifts. Harrison often had no way to know whether Fosbinder-Bittorf had worked during her meal period. She never spoke with Fosbinder-Bittorf about whether she could leave the premises during her meal break. Fosbinder-Bittorf cannot recall complaining to her about not being paid for missed meals.

### D. Employee Complaints

Fosbinder-Bittorf complained to Harrison and Rhondi Dorshorst, a human resources representative, about being too busy to take meal breaks. She does not recall whether she complained to them about not being paid for the missed breaks, and they did not ask whether she had cancelled the deduction for these breaks or instruct her to review her payroll. Defendant never asked her whether she was canceling the deductions for meal periods she missed or was interrupted. Other nurses on plaintiff's unit also complained about missing breaks, having to eat their meal quickly in the break room on their laps and being unable to leave the unit to go to the cafeteria.[4] Defendant's 30(b)(6) witness testified that he was "not surprised," given the nature of a nurse's job, that nurses find it difficult to take uninterrupted meal breaks. After learning that nurses were not getting full meal breaks, Harrison's "follow up" action was to remind nurses that "it is expected that everyone is to receive an uninterrupted 30 minutes break from the floor."

---

[4] Defendant objects to this testimony as hearsay. Although it would be hearsay if used to prove that nurses worked through meals, the fact that nurses complained and that manager's responded in staff meetings may be admissible to show SSM Health Care's knowledge or at least to establish an admission by a party opponent if made without objection within earshot of hospital employees responsible for implementing the policy.

Fosbinder-Bittorf also complained to her unit director and human resources about being unable to hand off her beeper during meal breaks. In staff meetings, the unit director acknowledged that nurses on Fosbinder-Bittorf's unit were taking beepers on breaks. Some nurses simply refused to accept beepers, others had too many to monitor already and others were too busy to pass off their beeper. Defendant did not increase staffing or implement a consistent break schedule to ensure that someone would be available to accept beepers while nurses went on breaks. Instead of keeping a unit director on all shifts to administer the break schedules, defendant relied on charge nurses to assign "beeper buddies" and determine when staff could take meal breaks.

### E. Opt-in Plaintiffs

Opt-in plaintiff Trisha Bratten worked as registered nurse at St. Mary's in the respiratory unit and as a float nurse from March 2008 until November 2010. Soon after she began work, Bratten's charge nurse told her that "management did not want us leaving the premises," because they need to remain available for patient care. (Bratten Dep., dkt. #23, at 46:5-20.) Her manager, Karen Brennan, also told her during an in-service that nurses on the night-shift were not allowed to leave the premises because the staff ratio was lower. (*Id*. at 44:15-45:4.) Bratten knew how to cancel the automatic meal deduction, but did not cancel it for all of the meal periods during which she worked. This was because she would be interrupted or would forget to cancel it immediately, and believed that she was not allowed to correct a missed cancellation retroactively.

Opt-in plaintiff Carolyn Mannina worked as a registered nurse at St. Mary's on

9

the pulmonary unit and as a float nurse from June 2006 until July 2011. Mannina did not leave the facility during her meal breaks, because she was afraid of being disciplined. "[H]er understanding was that as a [St. Mary's] nurse you were not allowed to leave the building for lunch," because "you had to remain within earshot of the alarms so that you could hear a code blue." (Mannina Dep., dkt. #24, at 14:4-7.) Mannina formed this belief as a result of (1) sporadic conversations among nurses on the floor and (2) an informal statement by her supervisor, Karen Brennan, that nurses should not leave the grounds.[5] (*Id*. at 37:10-18; 38:7-15.)

Around fifty percent of the time, Mannina ate her meal in the break room where she sometimes worked on charts, participated in in-services, or was interrupted by doctors and family members. On a few occasions, her supervisor ate with her in the report room. Mannina knew how to cancel the automatic deduction, but did not cancel it for all of the meal periods during which she worked or was interrupted, because she frequently was too busy to remember to cancel it on Kronos and later found it difficult to recall the precise day when she missed a meal.

Opt-in plaintiff Jolynn Myers worked as a registered nurse at St. Mary's in the pediatric unit and infrequently as a float nurse from February 2000 until September 2011. In February 2009, Myers wrote a letter to her unit director, Barb Behrend,

---

[5] Defendant objects that the testimony and declarations of Mannina, Bratten and Myers are (1) irrelevant because they worked in different units than Fosbinder-Bittorf; and (2) inadmissible hearsay because they were not management level employees. Because Mannina, Bratten and Myers testified about alleged policies applicable to all nurses, their testimony is relevant to Fosbinder-Bittorf's claim. Moreover, because they appear to have based their belief, at least in part, on statements by supervisors, their testimony may not be hearsay, but rather an opposing party's statement under Fed. R. Evid. 801(d)(2). Myers' testimony about what she told her unit director may also be admissible to show defendant's knowledge or an implied admission.

complaining that it was "almost impossible to get 30 minutes of uninterrupted lunch," because of understaffing and patient needs. Myers missed her meals so frequently that she considered any time she was able to eat a "meal" and did not cancel the deduction. She generally cancelled the deduction only when she did not have an opportunity to eat anything or take any break. She also frequently was too busy to remember to cancel the deduction and later found it difficult to recall the precise day on which she missed the meal. During a staff meeting, Behrend told Myers and other nurses on her unit that they were not to incur overtime for missed meals. On one occasion Myers cancelled her meal break and Behrend told her personally that she needed to "watch this." Myers responded that she did not take the overtime for meals on purpose, but it was necessary because of under-staffing.

### F. Overall Time Records

St. Mary's required nurses to card out on the Kronos system if they left the premises for any non-work time, including a meal period. Managers were required to review the nurses' timecards each pay period to ensure accuracy based on the manager's knowledge of the nurses' work hours, including exceptions such as whether employees punched out for a meal period during their shift. Managers were trained to ensure overtime was accurate and minimized.

Defendant produced its Kronos records for over 1000 putative class members for the three-year statutory period. The data includes nearly a million clock entries. Plaintiff compared in and out time entries to find any instances where the difference was

11

greater than 5 minutes and less than 45 minutes.[6] Over the course of three years, employees left the premises for a period between 5 and 45 minutes on 5,055 occasions and even this figure may be an *overestimate* because nurses also punched in and out when switching between units. Assuming each occasion represents a time when a nurse left for a meal break (which gives SSM Health Care the benefit of the doubt), nurses left the premises for their meal breaks on average 1.685 times per year. When the same analysis was performed on Fosbinder-Bittorf's time records, it showed that she left the hospital premises during her shift for a period between 5 and 45 minutes only once.

## OPINION

SSM Health Care filed its summary judgment motion along with its opposition to Fosbinder-Bittorf's motion for conditional certification, only three months after discovery opened and eight months before the dispositive motion deadline. No rules prohibit SSM Health Care from filing an early motion for summary judgment, and Fosbinder-Bittorf chose not to move under Fed. R. Civ. P. 56(d) to defer consideration of the motion until additional discovery was complete. Instead, she responded on the merits and asked the court to deny any *future* motion by SSM Health Care for leave to file a second motion for summary judgment.[7]

---

[6] Defendant objects to plaintiff's use of the time records, asserting it lacks sufficient information about the qualifications of the person who analyzed the data or her methods. (Dft.'s Resp. to Plt.'s PFOF #54-60, dkt. #86.) Defendant had access to the raw data and time to analyze it. Because defendant did not propose an alternative finding or identify inaccuracies, the proposed facts are admissible at least to the extent they summarize more voluminous writing under Fed. R. Evid. 1006. *Fid. Nat. Title Ins. Co. of N.Y. v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 753 (7th Cir. 2005) (mere assertion that summary *might* be inaccurate is insufficient to exclude under Fed. R. Evid. 1006).

[7] The court is not prepared to preclude a second motion if filed in a good faith effort to advance the

A. **Wisconsin State Law Claim**

Under Wisconsin law, an employee need not be compensated for a "bona fide meal period of 30 minutes or more," but the employee "must be completely relieved from duty," which means that she cannot be "required to perform any duties, whether active or inactive." Wis. Admin. Code DWD § 272.12(2)(c)(2). "[A]n employer must pay all employees for 'on duty' meal periods," which includes any meal period "where the employer does not provide at least 30 minutes free from work" or "where the employee is not free to leave the premises of the employer." Wis. Admin. Code DWD § 272.04(1)(c).

Fosbinder-Bittorf argues that all of her meal periods were compensable, because St. Mary's required her to remain on the premises. On the other hand, SSM Health Care argues that its meal period policy states explicitly that employees may leave the premises.

At least for summary judgment purposes, the policy is ambiguous. It states that "[e]mployees are required to remain on the hospital premises and be available for work during the paid rest periods, but activities are typically unrestricted during the unpaid meal period." Because of the contrast between rest periods and meal periods, the statement that meal periods are "unrestricted" likely means that employees *can* leave the premises, but it is unclear what the policy means by "*typically* unrestricted." Defendant's 30(b)(6) witness was uncertain whether the use of the word "typically" means that employees on most units may leave or that all employees may leave most of the time. In its brief, SSM Health Care asserts that "typically" means employees will sometimes miss a meal period or the meal will be interrupted (Reply Br., dkt. #87, at 12), which, if

---

disposition of this matter in a just, speedy and inexpensive manner, Fed. R. Civ. P. 1, and will consider any such motion by SSM Health Care when, and if, it is filed.

correct, implies that the rule is only tangentially related to whether nurses may leave during their meal period.

The management guide does not resolve these ambiguities. On the contrary, it says that employees have the option to leave, but may be expected to stay, as long as they choose to stay voluntarily. Defendant has not explained how to reconcile these seemingly conflicting clauses. Nor did it explain who has authority to decide whether nurses on a specific unit are expected to remain on the premises. Perhaps most importantly for purposes of Wisconsin law, the guide states explicitly that an employee is paid if her meal period is "eliminated," "not taken" or "interrupted due to work requirements," but never states that an employee is paid for meal periods when she is expected to remain on the premises.

Since SSM Health Care's written policies do not state unequivocally that employees may leave the premises during their meal period, and the management guide arguably implies that employees may be required to remain on the premises, a reasonable jury is not precluded from finding that plaintiff was not compensated for an uninterrupted meal break despite being required to remain on the premises.

This finding is further bolstered by other evidence in the record on summary judgment. Fosbinder-Bittorf will testify that during her new employee training, her unit director instructed her not to leave the premises during her meal break and never told her to cancel the meal deduction when not allowed to leave. She believed that she was not allowed to leave, because she was responsible for hearing and responding to any code blue called for her floor. That belief was reaffirmed by her charge nurses and fellow

nurses, including one occasion on which her charge nurse lectured her about not responding to a code blue during her meal break.

Defendant argues that Fosbinder-Bittorf's idiosyncratic beliefs about its code blue policy are insufficient to withstand summary judgment. At this point, however, it is unclear whether Fosbinder-Bittorf interpreted the hospital's code blue policy correctly. The present record would support findings that nurses were required to respond when a code blue was called for their floor and the nurse responsible for that patient was required to assist, answer questions and remain at the scene, but it is unclear these requirements related to the meal policy or any requirement to remain on the premises. At this stage, the court need not resolve the parties' dispute about whether the code blue policy required Fosbinder-Bittorf to remain on the premises, because she testified that her supervisor and charge nurses told her that she could not leave.

Moreover, Fosbinder-Bittorf has proof that she acted consistent with that directive. She rarely, if ever, left the premises during her meal period. In three years, she left the hospital premises for a 5 to 45 minute period only once. Most nurses rarely left the premises. At least on the present record, it would appear that nurses left the premises for their meal break on average 1.685 times *per year*. There are alternative explanations for this statistical data (maybe thirty minutes is enough time to eat but not "typically" to leave the premises or maybe the hospital food is just that good), but one reasonable explanation is that the hospital had an express or implied policy that nurses not leave the premises during meal breaks. Because Fosbinder-Bittorf has identified evidence that defendant instructed her not to leave the premises during her meal period and has data

suggesting that she and other nurses rarely left the premises during their meal period, the court will deny SSM Health Care's motion for summary judgment on her state law claim.

### B. Fair Labor Standards Act

As under Wisconsin law, the FLSA does not require an employer to compensate employees for a "meal period" in which the employee is "completely relieved from duty," which means she is not "required to perform any duties, whether active or inactive." 29 C.F.R. § 785.19(a). Unlike under Wisconsin law, however, employees need not be free to leave the premises to qualify as "completely relieved from duty." 29 C.F.R. § 785.19(b) ("It is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period."). The Seventh Circuit has held that an "employee is completely relieved from duty during a meal period 'when the employee's time is not spent predominantly for the benefit of the employer.'" *Alexander v. City of Chicago*, 994 F.2d 333, 337 (7th Cir. 1993) (quoting *Lamon v. City of Shawnee*, 972 F.2d 1145 (10th Cir. 1992)). Whether a meal break is predominantly for an employer's benefit depends on the circumstances surrounding its policies and is typically a factual matter. *Id*. at 337.

Defendant conceded for purposes of this motion that Fosbinder-Bittorf worked during certain meal periods without compensation, so this motion hinges on whether she can show that SSM Health Care had "actual or constructive knowledge" that she worked during her meal periods without cancelling the deduction. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173, 177 (7th Cir. 2011) (citations omitted). The employer has

"constructive knowledge" under the FLSA when it "had reason to know" or "should have known" that its employee performed uncompensated work. *Id.* at 177. Even if an employer has promulgated a rule against overtime or a procedure to report overtime, the employer may still be liable if it should have discovered by exercising reasonable diligence that its employees were not following the rule. 29 C.F.R. § 785.13; *Reich v. Dep't of Conserv. & Nat. Res., State of Ala.*, 28 F.3d 1076, 1084 (11th Cir. 1994) (despite repeated instructions not to work overtime, employer exercising reasonable diligence would have discovered its officers had worked unreported overtime, because they made arrests on days they reported no hours worked); *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 827 (5th Cir. 1973) (reasonable diligence would have uncovered that employees under-reported hours due to pressure by supervisors).

SSM Health Care argues that Fosbinder-Bittorf has not identified evidence that it knew or should have known she was working meal periods *without canceling the deduction*. In response, Fosbinder-Bittorf argues that the record supports a reasonable jury finding that SSM Health Care knew she and other nurses frequently worked during meal periods. For example, she complained about interrupted meals, her unit director saw her being interrupted and interrupted her during meals, the unit directors discussed nurses taking beepers on meals during staff meetings and nurses on her unit and other units (including the opt-in plaintiffs) complained about missing meal periods. Moreover, the managers or unit directors reviewed nurses' timecards for each pay period. Finally, Fosbinder-Bittorf argues that had SSM Health Care reviewed its time records with reasonable diligence, it would have discovered that nurses were generally working more often during meals

17

periods than they were cancelling the automatic meal deductions.

Given its knowledge about how often nurses' meal breaks were interrupted and how infrequently nurses cancelled the deduction, Fosbinder-Bittorf asserts a reasonable jury could find that it was unreasonable for SSM Health Care to continue blindly following the same automatic meal deduction policy. This latter argument rests, in substantial part, on discrepancies between how often nurses worked and cancelled the meal deduction. However, the only evidence in the summary judgment record on this score is that Fosbinder-Bittorf cancelled her meal deduction 35 times in almost three years of employment, despite working a substantial portion of her meal breaks. Her proposed findings of fact do not, however, identify any evidence about the percentage other nurses worked during meals or cancelled meal deductions.[8] This lack of evidence is unsurprising given the timing of this motion and the fact that SSM Health Care resisted class-wide discovery about the practices of other units and the knowledge of its other supervisors. (Plt.'s Br. on Mtn. to Compel, dkt. #88.)

As Fosbinder-Bittorf argued in her motion to compel discovery, she *could* have used evidence about the general nursing practices at St. Mary's to establish that SSM Health Care should have known that she was working off the clock. *See Valcho v. Dallas Co. Hosp. Dist.*, 658 F. Supp. 2d 802, 812 (N.D. Tex. 2009); *DeMarco v. Nw. Mem'l Healthcare*, No. 10-C-397, 2011 WL 3510896, *4 (N.D. Ill. Aug. 10, 2011). Rather than file a motion to defer consideration of the summary judgment motion under Fed. R. Civ. P. 56(d), however, she responded on the merits.

---

[8] SSM Health Care cited evidence about the rates of cancelled deductions for various units in its opposition to the motion for conditional certification, but its statistics were selective.

As a result, SSM Health Care would have the court address a stark question: could a reasonable jury conclude that twelve cancelations per year was suspiciously low, in light of Fosbinder-Bittorf and the other nurses' complaints, so that St. Mary's had reason to believe that Fosbinder-Bittorf was working during more meal periods than she cancelled? While several cases have addressed similar questions, they reveal no definitive trends. *Cp. Valcho*, 658 F. Supp. 2d at 812-13 (denying summary judgment for hospital when it knew plaintiff and others nurses were interrupted during meals frequently but plaintiff *never* reported missed meal) *and DeMarco*, 2011 WL 3510896, *4 (denying summary judgment for hospital when nurse complained about missing meal breaks but reported only eight missed meals in "several years") *with White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) (upholding summary judgment for hospital when nurse complained about missing meals but reported several missed meals in two years).

Even if the court could decide as a matter of law that Fosbinder-Bittorf did or did not cancel her meal deduction so frequently as to give SSM Health Care notice that she was working unpaid meal periods, deciding this artificial and isolated question is both unnecessary and would create procedural complications. SSM Health Care's summary judgment motion is limited to the claims of Fosbinder-Bittorf. She has presented enough evidence, if just barely, to suggest that St. Mary's had constructive knowledge through her supervisors that Fosbinder-Bittorf (even if no one else) was regularly uncompensated despite being required to work during meal breaks.

Even if this were not so, the court would still have to give plaintiff time to find a replacement plaintiff for the FLSA collective action. The case would proceed with a new

19

plaintiff for the FLSA claim, who could still develop class-wide statistical evidence and additional anecdotal evidence about the nursing practices at St. Mary's, making another round of summary judgment to test the sufficiency of any new evidence likely. Meanwhile, Fosbinder-Bittorf would remain a party to the putative class action under Wisconsin state law.

At this time, the court finds the more prudent and efficient course of action is to deny SSM Health Care's motion for summary judgment on Fosbinder-Bittorf's FLSA claim, without prejudice to renewing the motion. 10A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2728 (3d ed.) (court has discretion to deny a properly supported motion for summary judgment if further factual development is necessary); 11 Moore's Federal Practice § 56.07[3] (3d ed.) (court has limited discretion to deny otherwise proper summary judgment motion when "further pretrial activity . . . will sharpen the fact and law at issue and lead to a more accurate or just decision"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendant SSM Health Care of Wisconsin, Inc. (dkt. #69) is DENIED.

Entered this 4th day of March, 2013.

                                                    BY THE COURT:

                                                    /s/_____
                                                    WILLIAM M. CONLEY
                                                    District Judge